JAMES A. McLAUGHLIN[1] *vs.* MOJGAN B. AMIRSALEH & others.[2]

No. 04-P-997.

Norfolk. April 14, 2005. - April 3, 2006.

Present: PERRETTA, CYPHER, & GRAHAM, JJ.

*Rules of Professional Conduct. Contract,* Loan, Illegality. *Mortgage. Real Property,* Mortgage.

This court declined to recognize or to give effect to a mortgage, held and recorded by an attorney, on the property of a client whom he then represented and to whom he had personally loaned money during the course of his representation, where the attorney's actions in representing that client and obtaining the mortgage violated the public policy of Massachusetts as embodied in S.J.C. Rule 3:07, Canon 5, DR 5-103, and Mass.R.Prof.C. 1.8(j) as well as other principles of law concerning the enforcement of contracts. [880-885]

COMPLAINT filed in the Norfolk Division of the Probate and Family Court Department on March 14, 2002.

The case was heard by *Robert W. Langlois,* J., on motions for summary judgment.

*Brad P. Bennion* for Franklin K. Lane.

*R. Jacob Walters* for Ramin Shamoilzadeh.

PERRETTA, J. This appeal has its genesis in a California judgment of divorce between Mojgan Amirsaleh (Mojgan) and Amir Massoud Amirsaleh (Massoud) that provided that property owned by them in Brookline (the property) was to be sold and the proceeds divided equally between them. The Probate and Family Court appointed the plaintiff James A. McLaughlin as a special master to sell the property. Subsequent to the divorce judgment but long before the sale of the property, Mojgan

[1] In his capacity as a special master and trustee.

[2] Amir Massoud Amirsaleh; Amir Mahayar Amirsaleh; Ramin Shamoilzadeh; Franklin K. Lane; and Perkins, Smith & Cohen, LLP.

retained Franklin K. Lane, a California attorney, to represent her in various matters arising out of her divorce, including her debts. Lane soon began personally to lend Mojgan money. He secured those loans by taking a mortgage on the property in the amount of $140,000. The amount of the mortgage exceeded the amount of Mojgan's debt at the time of the mortgage as well as the limit on the amount of any encumbrance that she was allowed to put on the property. That limit, $50,000, was set by a California court order that Lane himself had earlier sought and obtained. Subsequent to the date of the mortgage and while purportedly acting on behalf of various corporations, Lane lent corporate funds to Mojgan.

After the property was sold, and based on the personal and corporate loans, Lane claimed entitlement to a payment in the full amount of the mortgage, $140,000. A Massachusetts probate judge determined that Lane's recovery should be limited to the amount of Mojgan's debts incurred at the time of the mortgage, $11,600. Lane appeals and argues that the mortgage entitles him to recover up to the $50,000 limit established in the order set by the court in California. Concluding that any recognition of Lane's mortgage would violate the public policy of Massachusetts, we vacate the amended judgment and remand the matter to the trial court for a redetermination of the amounts due Mojgan's creditors without regard to any claim by Lane based on the mortgage.

1. *The facts.* We recite the details of the complicated procedural history of this controversy. Although the California judgment of divorce was entered in December, 1991, the property was not sold until a little over ten years later, that is, on January 31, 2002. The purchase price was $325,000 and the net proceeds from the sale amounted to $252,317.13.

After the divorce but well before the sale of the property, Mojgan borrowed money from the defendant Ramin Shamoilza-deh (Ramin). Based on Mojgan's indebtedness to him, Ramin obtained a default judgment in California on November 9, 1992, in the amount of $99,579.31. A little over a week later, on November 17, 1992, the California court entered the order restricting Mojgan from "transferring, encumbering, hypothecating, selling or in any way disposing of [the property] without

prior written consent of the other party or prior order of the Court first having been obtained." In January, 1993, Ramin sought and obtained a writ of attachment on the property from the Brookline District Court based on the November 9, 1992, judgment in his favor.

Sometime in 1993, after the restriction set out in the order of November 17, 1992, Lane undertook the representation of Mojgan in various legal matters that included her attempts to collect support arrearages Massoud owed. In the course of representing Mojgan, Lane was able to have set aside the default judgment obtained by Ramin on November 9, 1992, and to have dissolved Ramin's attachment on the property.

Having successfully removed the default judgment and the attachment, Lane began, as of November, 1993, to lend Mojgan money, primarily (as he later testified) for her and her minor child's living expenses.[3] In June, 1994, Lane successfully sought to amend the order of November 17, 1992, which prohibited Mojgan from encumbering the property. The order, as amended, allowed Mojgan "to encumber $50,000 of the Brookline property." About a month later, on July 8, 1994, Mojgan entered into a "Loan Agreement" with Lane.

In November, 1994, Mojgan filed a complaint in the Norfolk Division of the Probate and Family Court Department, seeking enforcement of the divorce judgment. A judge appointed McLaughlin to act as a special master and trustee to sell the property and to hold the sale proceeds in an escrow fund. Shortly thereafter, on December 15, 1994, Mojgan signed a document entitled "Note Secured by Mortgage" made payable to Lane in the amount of $140,000.[4] The note replaced all prior notes, including any notes related to the earlier loan agreement of July 8, 1994. The note recited "value received" as consideration and was due on or before July 1, 1995. The same

---

[3]Some of the loans to Mojgan were from Lane's personal assets. Lane also signed checks made payable to Mojgan and drawn on the accounts of various business entities, including Providencia Ltd. and Ardon Mobile Corporation.

[4]Lane testified at trial that as of December, 1994, he had lent Mojgan $95,386. That amount included the amount of checks he had drawn in his corporate capacity against the accounts of various corporations. He also testified that the amount that he had lent Mojgan up through 1996 was over $221,000.

day, December 15, 1994, and notwithstanding the order limiting Mojgan's right to encumber her interest in the property to $50,000, Mojgan gave Lane a mortgage on the property in the amount of $140,000.[5] Also on that day, Mojgan entered into "a letter agreement" with Lane, later amended, whereby Lane agreed to continue to represent her on the condition that she execute his "standard Legal Services Agreement" as well as the promissory note in his favor in the principal sum of $140,000, bearing interest at the rate of ten percent per year. As further provided, the note was to be secured by the mortgage on Mojgan's one-half interest in the property.

Next, on January 4 or 5, 1995, Ramin's action against Mojgan, in which Lane had earlier obtained a removal of the default judgment and a dissolution of the attachment, came on for trial in California. Mojgan was represented by Lane at that time, but neither she nor he appeared. After Mojgan was again defaulted, Lane requested, by a letter dated January 6, 1995, the assistance of Massachusetts counsel "to beat the recordation" of Ramin's judgment against Mojgan, which had yet to be entered on the docket in California. In short, Lane requested that the mortgage be recorded in Massachusetts before judgment in Ramin's favor could be entered on the California docket and before Ramin could again obtain and record a writ of attachment.

Lane did beat Ramin to the courthouse. The mortgage was recorded on January 9, 1995. About two weeks later, on January 25, the California court entered a judgment in Ramin's favor in the amount of $118,708.33. While Lane engaged in an unsuccessful, if not frivolous, appeal from that judgment,[6] Ramin

---

[5]The mortgage gives Lane certain specified rights and provides, in part, that Mojgan "does hereby mortgage, grant and convey to [Lane], with power of sale," the Brookline property. Paragraph 15 of the mortgage reads:

"This Security Instrument shall be governed by [F]ederal law and the law of the jurisdiction in which the Property is located [Massachusetts]. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable."

[6]With respect to Lane's appeal, the Probate and Family Court judge found credible Mojgan's testimony that she had not requested Lane to appeal the

received a writ of attachment on the property on February 28, 1995. On May 4, 1995, a writ of execution on a money judgment issued.

Lane continued to represent Mojgan until the spring of 1999, at which time his license to practice in California was suspended because, according to him, he had failed to pay his State bar dues. In any event, McLaughlin was able to sell the property on January 31, 2002, for $325,000. The net proceeds from the sale amounted to $252,317.13. McLaughlin then filed the present complaint in the Probate and Family Court for interpleader and declaratory relief, asking that each of the defendants (see note 2, *supra*) be required to interplead and settle between themselves their respective rights to the sale proceeds and that the court declare their rights accordingly.

In July, 2002, Ramin filed his answer to the complaint. He asked the court to declare that he was a judgment creditor of Mojgan in the amount due him at that time, $118,813.88, plus interest, that his claims were superior to all other claims against the property, and that he be awarded one-half the sum held in escrow by McLaughlin.[7] Lane also filed an answer to McLaughlin's complaint in which he sought a declaration that his mortgage against Mojgan's one-half interest in the property was valid, enforceable, and superior to all other claims against the property.

We think it unnecessary to recite the additional procedural skirmishes among the parties. The important fact is that trial on McLaughlin's complaint was scheduled to begin on March 11, 2003. At that time, however, it appeared to the probate judge that the validity of Ramin's claim may have been adjudicated in California. Although Ramin's attorney disputed that point, the judge granted the parties additional time to obtain a clarification of the "relevant" California judgment and continued the trial until June 23, 2003.

During the trial thereafter conducted, Ramin's attorney

judgment. The judge also accepted Lane's acknowledgment of the fact that he was the only "party" to gain from the appeal.

[7]After a pretrial conference, the judge ordered that one-half of the sale proceeds from the property, representing Massoud's interest, be placed in escrow with a California court for a determination as to its ultimate distribution. The disposition of those funds is not at issue in this appeal.

questioned Lane about the propriety of his actions under provisions of the California Rules of Professional Conduct concerning the avoidance of interests adverse to a client and under § 2033 of the California Family Law Code regarding real property liens taken by an attorney from clients in domestic matters. Lane denied that he had violated the California Rules of Professional Conduct in taking Mojgan's note and mortgage and expressed his opinion that § 2033 of the Family Law Code did not apply to him. At the close of the trial, Ramin's attorney represented that he had provided the court with an amended judgment indicating that the California court had not made any adjudication on the merits of his claim. While the trial judge voiced his understanding that there was a ruling to that effect somewhere in the case file, he concluded that any such decision would have no effect on his trial determination because the California amended judgment had not been placed in evidence.

2. *The judgment.* On these facts, the judge awarded payment from the funds held in escrow to be made to Lane in the amount of $11,600, and to McLaughlin in the amount of $29,027.25 for his reasonable fees and costs.[8] The "remainder" of the fund was awarded to Ramin.[9] As a consequence of the judgment, Mojgan received little if anything from her one-half share of the proceeds from the sale of the property, which, as described by the judge, was "Mojgan's only significant, available, asset."

In determining the amount of Lane's share of the escrow funds, the judge found that Lane knew the $140,000 mortgage was far in excess of the amount of equity Mojgan had been authorized by the California court to encumber and that Lane had intentionally disregarded that order, but the judge nonetheless concluded that Lane "should receive proceeds from the sale of the Brookline property." However, the judge limited the amount of Lane's share by the terms of the California order

---

[8]The judge ordered that $1,462.50 of McLaughlin's award be paid from Lane's share of the proceeds, as that amount was caused solely by Lane's request that McLaughlin attend the trial.

[9]The judge also found that there were insufficient escrow funds to satisfy all the parties' interests, noting that no matter the outcome as between Lane and Ramin, the claim of Perkins, Smith & Cohen, LLP, see note 2, *supra*, would remain unsatisfied.

successfully sought by him ($50,000) and by the "actual consideration given by" Lane on or before December 15, 1994, the date Mojgan signed the note secured by the mortgage.

As found by the judge, Mojgan's mortgage to Lane was "supported only by the $11,600 in consideration, which was personally given to her by Lane" prior to the mortgage and for which he had receipts. While recognizing that various corporations may have made loans to Mojgan through Lane acting in a corporate capacity, the judge found that those loans were unsecured. The corporations had made those loans subsequent to the date of the mortgage to which only Lane and Mojgan were parties.

Although the judge neither cited nor relied upon either the California or Massachusetts rules concerning the ethical conduct required of lawyers, it is apparent from his statements during the course of the proceedings and his findings of fact that he was troubled by Lane's conflicted interests in the matter and his admitted roles as Mojgan's banker and lawyer.

3. *Lane's argument.* While conceding that the mortgage violated the California order limiting Mojgan's ability to encumber the property, Lane argues on appeal that his violation was a mere "technical[ity]" and asks that we rule that he is entitled to $50,000 (the limit of the order), plus the interest specified in the note, by reason of the priority of his mortgage.[10] He claims that although "the underlying obligation secured by a mortgage must be supported by some consideration, the mortgage itself need not be supported by new or separate consideration, nor may the court examine the amount of the underlying consideration." See *Perry* v. *Miller*, 330 Mass. 261, 264 (1953); *V. & F.W. Filoon Co.* v. *Whittaker Corp.*, 12 Mass. App. Ct. 932, 933 (1981); *Monaco* v. *Lombard Bros., Inc.*, 24 Mass. App. Ct. 941, 943 (1987). In Lane's view, once the judge found that there was consideration for at least some of the obligations secured by the mortgage, he was required, as matter

---

[10]At oral argument, counsel for Lane made clear that in view of the California court order authorizing Mojgan to encumber the Brookline property in the amount of $50,000, Lane was seeking to recover only up to $50,000 under the mortgage, plus, as specified in Mojgan's note, interest at the rate of ten percent per annum.

of law, to uphold the validity of the mortgage and to direct that Lane be awarded $50,000, plus interest, from the proceeds held in escrow.

4. *Discussion.* Because Lane cannot recover *any* of the escrow funds without recognition and enforcement of the mortgage within the limits of the order, the question before us is whether we will give effect to the mortgage and, if so, to what extent. Before we take up that issue, we note the reality of the situation: the dispute before us is between Lane and Ramin. No matter what our decision, McLaughlin will receive the fee he has earned from the escrow fund, and the remainder will then be available to satisfy holders of valid claims against the property. Mojgan will then be entitled to whatever might remain of the fund.

Based on Massachusetts public policy, as found in the body of Massachusetts case law concerning contracts and in the ethical canons and rules governing the practice of law, we conclude that Lane's mortgage is not entitled to recognition in Massachusetts.[11] Consequently, we do not take up the other various arguments advanced by Lane in his brief and at oral argument.[12]

It is settled that a contract in violation of law or public policy

[11]Although Lane made no argument in his brief addressing Massachusetts public policy, he cannot claim surprise about our concerns. The judge expressed his own qualm on this matter at trial and Ramin raised the issue in his brief. Lane, however, did not avail himself of the opportunity to address the issue in a reply brief, contrast *Clark* v. *Trumble,* 44 Mass. App. Ct. 438, 443-444 (1998), or at oral argument before us. In any event, it is settled that an appellate court may decline to lend its aid to enforce an agreement which it concludes violates public policy, even though that issue was neither raised in the pleadings nor considered by the trial judge. See *Goldfarb* v. *Marchionne,* 12 Mass. App. Ct. 933, 934 (1981).

In light of the foregoing, and in view of the provision in the mortgage's definition of "governing law" as both Federal law and the law of the jurisdiction in which the property is located (see note 5, *supra*), as well as Massachusetts law which has long held that the validity of a mortgage of land in Massachusetts is to be decided by the laws of the Commonwealth even if both parties to it reside in another State, see *Goddard* v. *Sawyer,* 9 Allen 78, 79 (1864); *Cheever* v. *Graves,* 32 Mass. App. Ct. 601, 610 (1992), we do not hesitate to look to our public policy with respect to the enforcement of the mortgage.

[12]Lane also argues that Ramin lacked standing to attack the mortgage; that even if Ramin has standing to attack the mortgage, the attack is made outside

will not be enforced. See *Nussenbaum* v. *Chambers & Chambers Inc.*, 322 Mass. 419, 421-422 (1948) ("In general, illegality in a contract is a defence only because it is against public policy that the court should be called upon to enforce contracts that the parties have been expressly or impliedly forbidden by law to make or to perform"); *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 320-321 (1996) (in denying enforcement of contractual terms for reasons of public policy, "public policy" refers to court's conviction, grounded in legislation and precedent, that denial is necessary to protect some aspect of public welfare); *A.Z.* v. *B.Z.*, 431 Mass. 150, 160 (2000) ("courts will not enforce contracts that violate public policy"). It is also an established maxim of equity that "[h]e who seeks equity must do equity." *New England Merchants Natl. Bank of Boston* v. *Kann*, 363 Mass. 425, 428 (1973). See Nolan & Sartorio, Equitable Remedies § 168 (2d ed. 1993). This so-called "clean hands" doctrine rests on grounds of public policy and the integrity of courts. See *MacCormac* v. *Flynn*, 313 Mass. 547, 549 (1943); *Deutschmann* v. *Board of Appeals of Canton*, 325 Mass. 297, 299 (1950). Cf. *Goldfarb* v. *Marchionne*, 12 Mass. App. Ct. 933, 934 (1981) (parties' conduct in executing agreement containing term deliberately designed to mislead taxing authorities justified denial of enforcement of promise at any price).

One source of expressed public policy is the body of rules governing the conduct of lawyers, the Massachusetts rules of professional conduct and its predecessor, the Massachusetts canons of ethics and disciplinary rules regulating the practice of law (Disciplinary Rules).[13] These rules are solidly grounded in public policy concerns. See *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. 525, 538 (1986); *Murphy* v.

the applicable six-year statute of limitation and is time barred; and that the judge failed to award Lane interest on his award in accordance with the terms of Mojgan's note and the mortgage.

[13]The Canons of Ethics and Disciplinary Rules Regulating the Practice of Law, S.J.C. Rule 3:07, 382 Mass. 768 (1981), as amended, 422 Mass. 1301 (1996), were replaced by the Massachusetts Rules of Professional Conduct, S.J.C. Rule 3:07, as appearing in 426 Mass. 1303 (1998), effective January 1, 1998. The question of an attorney's conduct prior to January 1, 1998, is resolved by application of the Disciplinary Rules. See *Matter of Bailey*, 439 Mass. 134, 145 n.13 (2003).

*Commissioner of the Dept. of Indus. Accidents*, 415 Mass. 218, 232 n.20 (1993); *Eisenstein* v. *David G. Conlin, P.C.*, 444 Mass. 258, 262 (2005); *Matter of Chimko*, 444 Mass. 743, 753 (2005); *Duggan* v. *Gonsalves*, 65 Mass. App. Ct. 250, 255-258 (2005).

Both S.J.C. Rule 3:07, Canon 5, DR 5-103(A), as appearing in 382 Mass. 779 (1981), and Mass.R.Prof.C. 1.8(j), 426 Mass. 1338 (1998), as in effect at and from the time Lane recorded his mortgage, prohibit an attorney from acquiring an interest in litigation except in certain limited circumstances.[14] None of those circumstances are applicable to the matter before us.

The basis for this rule has been explained and discussed at length. See, e.g., *Coggins* v. *New England Patriots Football Club, Inc.*, 397 Mass. at 538 ("Inherent in the acquisition by

_____

[14]Supreme Judicial Court Rule 3:07, Canon 5, DR 5-103, as appearing in 382 Mass. 779 (1981), provides, in full:

"DR 5-103 Avoiding Acquisition of Interest in Litigation.

"(A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:

"(1) Acquire a lien granted by law to secure his fee or expenses.

"(2) Contract with a client for a reasonable contingent fee in a civil case.

"(B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

Disciplinary Rule 5-103(A) is now found in the substantially similar provisions of Mass.R.Prof.C. 1.8(j), 426 Mass. 1340 (1998), while DR 5-103(B) finds expression in a much altered form in Mass.R.Prof.C. 1.8(e), 426 Mass. 1339 (1998).

We note that the general rule prohibiting a lawyer from acquiring a proprietary interest in litigation "has its basis in common law champerty and maintenance." Comment [7] to Mass.R.Prof.C. 1.8, Mass. Ann. Laws, Rules of the Supreme Judicial Court, at 281 (LexisNexis 2005). Although we no longer recognize those doctrines, see *Saladini* v. *Righellis*, 426 Mass. 231 (1997), the rules of professional conduct pertaining to a lawyer's acquisition of a proprietary interest in litigation remain in full force and effect. We are also aware that a violation of a disciplinary rule or rule of professional conduct is not in and of itself an actionable breach of duty by a lawyer to the client. See *Fishman* v. *Brooks*, 396 Mass. 643, 649 (1986).

counsel of a financial interest in litigation is the danger . . . that counsel will not exercise independent professional judgment"). See also Annotated Model Rules of Professional Conduct 162 (5th ed. 2003) ("The Rule is intended to prevent conflicts of interest that might interfere with the lawyer's exercise of independent judgment on the client's behalf"); *id.* at 144-145; Restatement (Third) of the Law Governing Lawyers § 36 comment b (2000) ("The justification for the rule in its present form is that a lawyer's ownership gives the lawyer an economic basis for claiming to control the prosecution and settlement of the claim and provides an incentive to the lawyer to relegate the client to a subordinate position"); Rotunda & Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility § 1.8-10 (2005) (when lawyer acquires ownership interest in subject of representation, it may be more difficult for client to discharge lawyer should client so desire).

The harm this rule is intended to prevent is concretely demonstrated by Lane's actions in this case. As previously set out in part 1 of this opinion, *supra*, the materials in the record appendix show that Lane, during his representation of Mojgan on matters arising out of and connected to her divorce, took actions directly in opposition to her interests.

First, after loaning Mojgan his personal funds, Lane obtained the mortgage on the property (which the judge found to be "Mojgan's only significant, available, asset") in a stated amount ($140,000) that he knew to be well in excess of the limit set by the California court. Second, acting in his corporate capacity and in reliance on the mortgage, he then arranged for corporate loans to Mojgan. By so doing, Lane vested in himself Mojgan's legal right to her share of the sale proceeds of the property. See *Maglione* v. *BancBoston Mort. Corp.*, 29 Mass. App. Ct. 88, 90 (1990) ("in Massachusetts, the granting of a mortgage vests [legal] title in the mortgagee to the land placed as security for the underlying debt," while equitable title is retained by mortgagor); *Teschke* v. *Keller*, 38 Mass. App. Ct. 627, 634 (1995) ("In this State, a mortgagee acquires 'title' from the mortgagor subject only to the latter's right of redemption and encumbrances and liens of record"). Lane did not take either of

those actions for purposes of securing his fees or expenses incurred on Mojgan's behalf.[15]

Third, after successfully removing Ramin's default judgment against Mojgan and the consequent writ of attachment on the property and then obtaining a mortgage on that property, Lane failed to appear on Mojgan's behalf in the action in which Ramin again sought a judgment on the basis of his loans to her. Fourth, after Mojgan was defaulted for a second time because of her and Lane's failure to appear, Lane took an appeal from that judgment, see note 6, *supra*, and immediately retained Massachusetts counsel for the purpose of recording his mortgage before Ramin's second default judgment could be entered and Ramin could again obtain a writ of attachment. By his actions, Lane "beat" Ramin in the race to the courthouse in Massachusetts.

There is more. Fifth, rather than promote the sale of the property for his client, Lane chose to argue the priority of his interest in the property over that of Ramin.[16] Sixth, throughout this entire time, Lane continued to lend money to Mojgan through corporations, bringing the loans to a total amount, personal and corporate, exceeding the $50,000 cap on encumbrances of Mojgan's share of the property. Seventh, Lane not only testified at trial that the loans he extended to Mojgan were not for the fees and expenses he incurred on her behalf, see

---

[15]Lane testified unequivocally at trial that he did not "take a security interest for attorney's fees." Nor can his mortgage reasonably be viewed as, essentially, a contract with a client for a contingent fee. See S.J.C. Rule 3:05, as appearing in 382 Mass. 762 (1981), which now appears in substantially different form in Mass.R.Prof.C. 1.5, as amended, 432 Mass. 1301 (2000), regulating ethical practices in respect to contingent fee agreements. Both rule 3:05(3) and Mass.R.Prof.C. 1.5(d)(1) prohibit contingent fee agreements in domestic relations matters such as those in the appeal before us. In this regard, see generally *Guenard* v. *Burke*, 387 Mass. 802, 807 (1982); *Cox* v. *Cox*, 56 Mass. App. Ct. 864, 880 (2002).

[16]McLaughlin indicated to the judge that the delay in the sale was attributable to the "extensive animosity between [Lane and Ramin] about their attachments, and that their attachments only went to [Mojgan's] share . . . [and] exceeded the value of the real estate." It should be recalled that Ramin had secured a judgment by default against Mojgan prior to the restriction imposed by the California court and had almost immediately obtained a writ of attachment on the property, and that Lane subsequently was able to have that default judgment set aside and the writ of attachment dissolved.

note 15, *supra*, he also admitted that the mortgage put him in a position potentially adverse to her interests.

By the terms of the amended judgment, the judge recognized Lane's mortgage, even if to a limited extent. That is, he allowed Lane to recover the amount of Mojgan's debt to him at the time of the mortgage. In recognizing the mortgage, the judge effectively reduced the amount of Ramin's recovery on his writ of attachment for loans made to Mojgan long before Lane began to represent her.

We decline to recognize or to give effect to the mortgage held and recorded by Lane, not because of any violation of either DR 5-103 or Mass.R.Prof.C. 1.8(j), but because we conclude that his actions in representing Mojgan and obtaining the mortgage violate the public policy of Massachusetts as embodied in those rules as well as other principles of law concerning the enforcement of contracts.[17] Cf. *Pettingell* v. *Morrison, Mahoney & Miller*, 426 Mass. 253, 256 (1997) (violation of rule of professional conduct does not preclude enforcement of forfeiture clause unless policy reason underlying rule compels different conclusion); *Eisenstein* v. *David G. Conlin, P.C.*, 444 Mass. at 259, 262-265 (court declined to enforce provisions of lawyers' partnership agreement that violated rule of professional behavior and impinged on strong public interest in allowing clients to retain counsel of their choice). The fact that Ramin will most likely benefit from our decision does not outweigh the previously described circumstances, which compel us to refuse to give any recognition to the mortgage held by Lane.[18]

5. *Conclusion.* It follows from what we have said that the amended judgment is vacated, and the matter is remanded to

---

[17] We express no opinion as to what remedies, if any, Lane may have against Mojgan or Ramin in California.

[18] Ramin's failure to file a cross appeal from the judgment does not preclude us from considering whether we should give recognition to the mortgage. The general rule that an appellee may not secure favorable modification of a judgment unless he has filed a cross appeal, if applicable in the present case, is one of practice rather than jurisdiction. See *O'Connor* v. *City Manager of Medford*, 7 Mass. App. Ct. 615, 617-618 (1979). An appellate court may take appropriate action where circumstances compel it. See *ibid.*; *Karellas* v. *Karellas*, 61 Mass. App. Ct. 716, 723 (2004).

the Probate and Family Court for the entry of a new judgment based on a recalculation of the amounts due McLaughlin and Mojgan's creditors without consideration of any rights claimed by Lane by reason of the mortgage.

*So ordered.*