LAWRENCE vs. LACHOWITZ, MISC 17-000627

































 
 STEPHEN P. LAWRENCE, ALLAN GREENSTEIN, and JUDITH B. GREENSTEIN, as Trustees of the Nancy R. Lawrence and Robert G. Lawrence Family Trust, u/d/t dated November 15, 1991, Plaintiffs, v. JOANNE P. LACHOWITZ, ALAN LACHOWITZ, and HIDDEN COVE PROPERTY OWNERS ASSOCIATION, INC., Defendants
 MISC 17-000627 
 MAY 25, 2021
DUKES COUNTY, ss.
VHAY, J.
DECISION AND ORDER














 Plaintiffs Stephen P. Lawrence, Allan Greenstein, and Judith B. Greenstein, as Trustees of the Nancy R. Lawrence and Robert G. Lawrence Family Trust, u/d/t dated November 15, 1991 (the "Greensteins"), own a property at 21 Stone Pound Way in Oak Buffs, Massachusetts (the "Greenstein Parcel"). Defendants Joanne P. Lachowitz and Alan Lachowitz own a property and reside at 14 Harvester Way in Oak Bluffs (the "Lachowitz Parcel"). The Greenstein and Lachowitz Parcels abut each other. Both parcels are registered land. Both parcels also are subject to a Master Declaration of Reservations and Restrictions dated January 15, 1981, as amended and extended (the "Master Declaration"). The Master Declaration covers several parcels in addition to the Greenstein and Lachowitz Parcels. This Decision will refer to the affected properties collectively as "Hidden Cove." 





 The Master Declaration calls for an organization of the owners of the Hidden Cove lots. Defendant Hidden Cove Property Owners Association, Inc. (the "Association") is that organization. Section § 3.02 of the Master Declaration requires the Association to have an "Approval Committee," which shall "carry out all . . . duties imposed upon it by the provisions of this Declaration." 





 This case centers on § 2.20 of the Master Declaration. It provides in pertinent part: 





 No trees or heavy brush shall be planted or allowed to grow on Residence Areas . . . which would materially obstruct pre-existing or established water views within the Hidden Cove area. However no vegetation shall be removed or altered to maintain said waterviews until plans identifying the specific vegetation to be affected, the work areas, and method by which the work is to be performed shall have been approved by the Approval Committee. 





 The Greenstein and Lachowitz Parcels are "Residence Areas" under the Master Declaration. The Lachowitz Parcel encompasses the Lachowitz residence and extends beneath a waterbody, Herring Pond, to include an area on the other side of the pond that abuts the Greenstein Parcel. This decision calls that isolated portion of the Lachowitz Parcel the "Northern Portion of the Lachowitz Parcel" or the "Northern Portion," for short. 





 The Greensteins purchased the Greenstein Parcel in 1995. They claim that when they bought the parcel, they had across the Northern Portion water views of both Herring Pond and a body of water beyond the pond, located on land of the Sheriff's Meadow Foundation (the "SMF Pond"). The Greensteins contend that through 1999, they maintained the Northern Portion (with permission of the property's then-owner) to preserve those water views. The Greensteins argue, however, that when the Lachowitzes bought their parcel in 1999, they halted the Greensteins' maintenance of the Northern Portion. The Greensteins claim that in the years since, trees and heavy brush have reduced the Greensteins' water views. The Greensteins also contend that in 2004, the Lachowitzes orally agreed to restore those views.





 The Lachowitzes deny the Greensteins' claims. The Lachowitzes further argue that a 2004 order of conditions (the "Order of Conditions") issued by the Conservation Commission of the Town of Oak Bluffs (the "Conservation Commission") prohibits the Lachowitzes from restoring and maintaining the Greensteins' alleged water views in the manner the Greensteins want. 





 The parties appeared in January 2021 for a trial by videoconference on four issues. They presented closing arguments on March 19, 2021. The Court also took a view of the Greenstein and Lachowitz parcels on September 17, 2020. Having heard the parties' witnesses, having reviewed the evidence admitted at trial, having taken a view, and having heard and read the arguments of counsel, the Court FINDS the facts described above as well as these: 





 1. When the Greensteins purchased their property in 1995, the residence on the Greenstein Parcel had a clear view of Herring Pond, across the Northern Portion. The residence had views of parts of Herring Pond in roughly two directions, on each side of an oak tree (and, close behind and flanking the oak tree, two eastern red cedars) that then grew on the Northern Portion. The three trees (the "Central Trees") were living at the time of the Court's view. The Greenstein residence also had views, in the same directions, of parts of the SMF Pond. The residence enjoyed those water views from each of the residence's three floors, although bushes on the Greenstein Parcel obscured some of the water views visible from the lowest level of the Greenstein residence. 





 2. The water views visible as of 1995 from the rear of the Greenstein residence and to the left of the Central Trees lay at the end of what was a mown grass fairway (the "Fairway"). As of 1995, there were only three trees in the Fairway, a beetlebung, an oak and a maple. While not taken in 1995, the photographs that are Trial Exhibits 45 and 46 depict parts of the water views that were visible from the Greenstein residence, looking down the Fairway, as of 1995. 





 3. The water views visible as of 1995 from the rear of the Greenstein residence and to the right of the Central Trees lay beyond a more natural, less frequently mown area (the "Brushy Area"). While not taken in 1995, the photographs that are Trial Exhibits 47 and 49 depict parts of the water views that were visible from the Greenstein residence over and beyond the Brushy Area as of 1995. What's now the Lachowitz residence, across Herring Pond from the Northern Portion, was also visible in 1995 from the rear of the Greenstein residence and to the right of the Central Trees.





 4. The Greenstein residence also enjoyed, as of 1995, water views through the branches of the Central Trees, particularly once the oak tree's leaves fell. There was no vegetation behind the Central Trees that blocked those water views. 





 5. At the time the Greensteins purchased the Greenstein Parcel, what this decision calls the Lachowitz Parcel was owned by the Gross family. The Grosses gave the Greensteins permission to maintain the Northern Portion, and the Greensteins did so with the help of a caretaker, Patricia Peters. Ms. Peters regularly mowed and "weed whipped" virtually all the Fairway, from left to right (from the perspective of the Greenstein residence) and to within three to four feet of Herring Pond. (With one exception: Peters helped the Greensteins plant in the Fairway a 12' by 12' raised bed. The Greensteins grew small flowers and herbs in the bed, which was eighteen inches high.) Peters also regularly cut any brush that was growing around the beetlebung, oak and maple trees in the Fairway. Peters's mowing was regular enough to prevent seedlings of shrubs, trees, and other woody vegetation from growing in the Fairway. Peters's maintenance also included trimming the vegetation near the Central Trees to a two-foot height. Peters mowed less frequently and less extensively in the Brushy Area. 





 6. During the period the Greensteins maintained the Northern Portion, they didn't check if any part of the Northern Portion was within the jurisdiction of the Conservation Commission. They also didn't ask if their maintenance of the Northern Portion was lawful. 





 7. Defendant Joanne Lachowitz purchased the Lachowitz Parcel in 1999. Shortly thereafter, the Lachowitzes told the Greensteins to stop maintaining the Northern Portion. The Greensteins complied. 





 8. Sometime between 1999 and 2002 or 2003, the Lachowitzes planted a row of rosa rugosa bushes (which some trial witnesses called "primroses") along the property line between the Greenstein Parcel and the Northern Portion. A few years later, the Lachowitzes constructed a low stone wall (the "Stone Wall") along the same property line. 





 9. Initially, the Lachowitzes' maintenance of the Northern Portion didn't result in obstruction of the Greenstein Parcel's water views. But by 2002 or 2003, the rosa rugosas and natural growth on the Northern Portion prompted the Greensteins and several other Hidden Cove owners to complain to the Association that the Lachowitzes weren't complying with § 2.02 of the Master Declaration. (The Greensteins objected not only to the growth of trees and brush, but also to the Stone Wall.) Around this same time, the Lachowitzes noticed that someone had cut, without their permission, several trees on the Northern Portion. 





 10. The vandalism and their neighbors' complaints prompted the Lachowitzes to contact the Conservation Commission. The Commission's chairperson, Joanne Hughes, recommended that the Lachowitzes hire Russell ("Rusty") Walton, a Vineyard naturalist, for help. Hughes believed that much of the Northern Portion was subject to the state and local wetlands-protection laws. She also felt that the Lachowitzes would need the Commission's approval for any work done on the Northern Portion. 





 11. The Lachowitzes hired Mr. Walton in 2003. He determined that any work done on most of the Northern Portion would be subject to the Commission's jurisdiction. He then helped the Lachowitzes prepare a vegetation management plan for their property and submit it to the Commission for approval. Before they filed their request for approval (a "Notice of Intent"), the Lachowitzes informally consulted with Chairperson Hughes, and had her come at least twice to the Northern Portion. 





 12. In May 2004, the Commission approved the Lachowitzes' Notice of Intent, in the form of an Order of Conditions. The Order incorporates by reference a plan titled "Additional Wetland Boundary Markers Placed by Russell Walton" dated September 13, 2003 (Trial Exhibit 9). The Lachowitzes have received extensions of the Order every five years since 2004. 





 13. The Order of Conditions treats the Lachowitz Parcel as having three sections, the "Northern Side of Herring Pond," the "Causeway," and the "Southern Side of Herring Pond Near Residence." The Northern Portion is identical to what the Order of Conditions calls the Northern Side of Herring Pond. 





 14. In preparing and participating in the Commission's proceedings on the Notice of Intent, the Lachowitzes didn't make their obligations to their neighbors under § 2.02 of the Master Declaration a priority. The Order of Conditions contains requirements that acknowledge the Master Declaration's "covenants" (see page 4B of the Order of Conditions), but the Lachowitzes never advocated for maximum flexibility under the Order of Conditions to maintain or restore the Greensteins' original water views. Ms. Lachowitz told the Commission that she and her husband "were distraught over neighbors telling us what we're supposed to do. Neighbors had come to ask to cut things down on my property and I knew that I wasn't allowed to do that. . . ." Instead of looking for permission to protect her neighbors' water views, Lachowitz wanted the Commission to tell her "what I'm supposed to be doing. . . ." She admitted at trial that she didn't know what the Greensteins' original water views were. 





 15. Since the issuance of the Order of Conditions, Ms. Lachowitz has performed much of the Northern Portion's maintenance herself. (The Order of Conditions doesn't require that. It allows the Lachowitzes to contract for that work, provided they tell the Conservation Commission whom the "project supervisor" is. See Order of Conditions, ¶ 10.) The Lachowitzes haven't done any work beyond what they believe the Order of Conditions allows them to do. 





 16. The Lachowitzes' receipt of the Order of Conditions squared things with the Commission but didn't satisfy the Greensteins. In mid-2004, Mr. Greenstein met with the Lachowitzes. He hoped to convince them to agree to remove the rosa rugosas and maintain the Northern Portion in a way that would restore the Greensteins' original water views, in exchange for the Greensteins dropping their still-unresolved objections under the Master Declaration to the Stone Wall. 





 17. Mr. Greenstein left his 2004 meetings convinced he'd gotten his desired agreement. He hadn't. The Court credits Ms. Lachowitz's testimony that by the time of the 2004 meetings, she'd already agreed to the Order of Conditions. She told Greenstein that she would remove the rosa rugosas, but as to Greenstein's other demands, she responded obliquely that she would maintain the Northern Portion "as she was supposed to." In her mind, that meant maintaining the Northern Portion to the extent of what she thought the Order of Conditions allowed. She didn't make her private reservation clear, however, to Greenstein. 





 18. The Lachowitzes' termination of the Greensteins' maintenance of the Northern Portion, coupled with the Lachowitzes' less aggressive approach to maintenance (relative to what Ms. Peters had done), has allowed trees and brush to block the water views from the Greenstein residence that existed between 1995 and 1999. 





 19. The Greensteins want the Court to order the Lachowitzes to perform specific work on the Northern Portion. The Greensteins describe that work in a proposed Judgment and Order docketed January 25, 2021 (the "Proposed Judgment"). The Lachowitzes contend they either are doing the work already or that the Order of Conditions prevents them from performing it. The Greensteins' requested work (underlined below) and the Court's findings with respect to that work are as follows (lettered areas are as shown on Trial Exhibit 17): 





 A. "[S]electively brush cut all areas that are not mowed or within the five foot buffer zone along Herring Pond . . . while retaining Swamp Maple and Cedar Trees as advised by the . . . Conservation Commission." [Note 1] The Order of Conditions appears to allow this work. But Ms. Lachowitz testified that she selectively cuts brush only once per year. 





 B. "[S]electively brush cut, biannually," an area of uncut grass near a blueberry cluster in Area A and the uncut grass in Area D. The Order of Conditions appears to allow brush in these areas to be selectively cut biannually. Ms. Lachowitz testified she selectively cuts brush in these areas only once per year. She also testified that her equipment can't remove vegetation greater than one inch in diameter, which means that once stalks exceed that diameter, the Lachowitzes have allowed them to flourish. 





 C. "[S]electively brush cut . . . biannually," the vegetation surrounding a cluster of oaks in Area B, including the area behind and underneath the large oak tree. Ms. Lachowitz testified that she cuts only "around the edges" of Area B, and not within the interior of Area B. 





 D. "Brush cut the area surrounding the smaller oaks behind big oaks on water side, including the smaller oaks," in Area C. Ms. Lachowitz testified that she cuts brush around the smaller oaks in Area C, but maintains ("coppices") the oaks themselves. The Order of Conditions doesn't expressly address, however, whether one could cut down the oaks completely. Lachowitz said she had kept the oaks to satisfy what she called an obligation under Northern Portion Condition #17 to "[r]eplant 50+ seedling cedars, native rose bushes and pines cut to ground by vandals." The oaks are neither cedars, rose bushes, or pines. It's also not clear whether the Commission required the replanting or merely authorized the Lachowitzes to renew the area following its vandalization. 





 E. "[B]rushcut twice per year[ [Note 2]]" honeysuckles in Area E. Ms. Lachowitz testified to cutting brush in Area E only once per year. 





 F. "[S]electively brushcut biannually" Area F, including two small pitch pines, an oak sapling, and sumac. Ms. Lachowitz testified she selectively cuts brush in Area F only once per year. She also maintains the pitch pines and an oak sapling at a height greater than six inches. She cuts the sumac to the ground one time annually. 





 G. "[M]aintain . . . at a height of no more than four feet" the cedars in Area G. While Special Condition #18 states, "Northern side of Herring Pond #14: Small seedling cedars shall be maintained at a height no higher than four feet," the Court finds that the Lachowitzes have allowed the cedars in Area G to exceed four feet in height. The parties also dispute whether the Conservation Commission intended by Special Condition #18 to have the Lachowitzes keep those cedars at four feet or whether it allows them to cut those cedars substantially lower than that. Northern Portion Condition #14 further states: "Keep and maintain small seedling Cedars no taller than mature ragweed." It is unclear to which cedars Condition #14 refers. 





 H. "[B]rush cut . . . biannually" the "Bush Clusters" in Area H. It is disputed whether the Order of Conditions allows "brush cutting" (as opposed to "selective" brush cutting) in Area H. Ms. Lachowitz nevertheless testified that she selectively cuts brush only once per year in Area H, and not twice. 





 20. Abutting the Greenstein Parcel (to the southwest) and the Northern Portion (to the west) is a parcel owned by the Showalter family. The Stone Wall separates the Showalter parcel from the Northern Portion. Part of the Showalter parcel appears in Trial Exhibit 178 (to the left of the Stone Wall) and in Trial Exhibit 62 (to the right of the bushes that occupy the lower center of the photograph). At the time of the Court's view of the Northern Parcel (as well as at the time Trial Exhibits 62 and 178 were taken), the vegetation on the Showalter parcel abutting the Northern Portion was much lower than the vegetation on the Northern Portion. At the time of the Court's view, the vegetation on the Showalter parcel, immediately opposite the Northern Portion over the Stone Wall, had been cut or flattened, and appeared similar to the parcel's vegetation as shown in Trial Exhibit 62. At the time of the Court's view, the vegetation on the Showalter parcel was lower even than what appears in Trial Exhibit 178. 





 21. There's an order of conditions for the Showalter parcel. That order allows only hand cutting, to specified heights, of specific vegetation in ten-foot buffer zones along Herring Pond and a stream that runs through the parcel. A "Gravely" mower is used elsewhere on the Showalter parcel (including areas near the Northern Portion) to reduce plants to a six-inch height. Annual mowing by the Gravely prevents large brush from growing on the Showalter parcel. 





 22. Abutting the Northern Portion to the northeast is a parcel owned formerly by the Brothers family. That lot borders on a neck of Herring Pond. At the time of the Court's view, the vegetation on much of the Brothers parcel approaching the Pond was mown grass, much like the Fairway. The Brothers parcel has an order of conditions. The terms of that order are similar to those for the Showalter parcel (see Finding #21). The person responsible for supervising work under the Showalter and Brothers parcels, Richard Johnson, testified that the parcels with the large numbers 2, 3, 15, 19, 20, 33, 40, 43 and 44 on Trial Exhibit 21, many of which abut Herring Pond, the SMF Pond, or other nearby ponds and wetlands, have orders of conditions allowing work similar to that on the Showalter and Brothers parcels. 





***





 The parties appeared for trial on four issues: (1) did the Lachowitzes promise the Greensteins to maintain the Northern Portion so as to preserve the Greensteins' water views; (2) if the answer to question 1 is "yes," did the Lachowitzes break that promise; (3) have the Lachowitzes breached § 2.02 of the Master Declaration; and (4) does the Order of Conditions make it impossible for the Lachowitzes to (a) perform whatever contractual obligations they may have to the Greensteins; and (b) comply with § 2.02 of the Master Declaration. The Court addresses each issue in turn. 





 The Alleged Oral Agreement. The Greensteins contend the Lachowitzes orally agreed in 2004 to maintain the Northern Portion in a manner that would protect the Greensteins' original water views, in exchange for the Greensteins dropping their opposition (before the Association) to the Stone Wall. "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract . . . ." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875 , 878 (2000). If there's no evidence of a meeting of the minds regarding the terms of an alleged agreement, there's no enforceable contract. See Vacca v. Brigham & Women's Hosp., Inc., 98 Mass. App. Ct. 463 , 469 (2020).





 That describes the situation here. Although Mr. Greenstein wanted to settle things with the Lachowitzes in 2004 in a manner that would lead to the restoration of his water views, the Lachowitzes didn't agree to do that. Ms. Lachowitz responded to Greenstein's requests in a noncommittal and unspecific way. The Court thus holds that the parties didn't have a meeting of the minds in 2004 over maintenance of the Northern Portion. And because the parties didn't have a meeting of the minds over maintenance, the Court can't hold the Lachowitzes liable for breaching that agreement (issue #2 for trial). The Court will enter judgment in favor of the Lachowitzes, and against the Greensteins, on the Greensteins' contractual claims. 





 Violation of § 2.02. The interpretation of a restriction on real property is a question of law. The court's task in interpreting a restriction 





 "is to ascertain the intention of the parties in executing and accepting the [documents of conveyance]. That intention is to be found in the words used interpreted in the light of all the material circumstances and the pertinent facts known to the parties." A restrictive covenant must, however, "be strictly interpreted in favor of limiting the restraint on use of the granted premises." 





Well-Built Homes, Inc. v. Shuster, 64 Mass. App. Ct. 619 , 634-35 (2005) (citations omitted, brackets in original), quoting Allen v. Massachusetts Bonding & Ins. Co., 248 Mass. 378 , 383 (1924), and Brennan v. Kos, 15 Mass. App. Ct. 513 , 514 (1983). A court must resolve any ambiguities in the language of a restrictive covenant "'in favor of freedom of the land from servitude.'" Well-Built Homes, 64 Mass. App. Ct. at 636, quoting Boston & Maine R.R. v. Construction Machinery Corp., 346 Mass. 513 , 518 (1963). 





 Section 2.02 provides in part that "[n]o trees or heavy brush shall be . . . allowed to grow on Residence Areas . . . which would materially obstruct pre-existing or established water views within the Hidden Cove area." The Court holds that the Lachowitzes have breached their obligations under § 2.02. When the Greensteins purchased their property in 1995, there were water views from their residence, across the Fairway, over the Brushy Area, and occasionally through the nearby oak and cedars. Those views were both "pre-existing" and "established" as of 1995. See The American Heritage College Dictionary, 1098 (4th ed. 2004) (defining "preexisting" as "existing before; preceding"); id. at 478 (defining "establish" as "set up; found"). [Note 3] The Greensteins' water views continued to be "established" through 1999. There's also no proof that the Greensteins (who essentially assumed the Grosses' maintenance responsibilities under § 2.02) enlarged the water views. 





 In 1999, the Lachowitzes ended the Greensteins' maintenance activities. At that point, the Lachowitzes assumed practical responsibility for complying with § 2.02 of the Master Declaration. They nevertheless have allowed both trees and heavy brush to obstruct the 1995- 1999 era, pre-existing water views from the Greenstein parcel. The Lachowitzses thus have breached § 2.02. 





 The Effect of the Order of Conditions. Under Massachusetts law, "[t]here is no superseding public policy between the somewhat differing general principles that, on the one hand, disfavor land use restrictions, and, on the other hand, uphold contractually bargained for restrictions that permit landowners to use their land in certain ways." Stop & Shop Supermarket Co. v. Urstadt Biddle Properties, Inc., 433 Mass. 285 , 292 (2001). See also Tonsberg v. Lanza, 27 LCR 394 , 399 (2019), aff'd, 98 Mass. App. Ct. 1121 (2020) (same). Chapter 184, § 30 codifies various long-standing equitable limitations on a party's right to enforce restrictions on real property. See Blakeley v. Gorin, 365 Mass. 590 , 595-598 (1974). Those limitations fall generally into two categories. First, § 30 narrows "the class of persons who may seek enforcement of restrictions." Tonsberg, 27 LCR at 399. The first class of restrictions doesn't play a role in this case, as the Lachowitzes haven't challenged the Greensteins' standing under § 30 to seek enforcement of § 2.02 of the Master Declaration. Second, the third sentence of § 30 limits or prevents enforcement of specific types of restrictions: 





 No restriction . . . benefit shall be enforced or declared to be enforceable, except in appropriate cases by award of money damages, if (1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages, or (2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce except by award of money damages, or (3) in case of a common scheme the land of the person claiming rights of enforcement is for any reason no longer subject to the restriction or the parcel against which rights of enforcement are claimed is not in a group of parcels still subject to the restriction and appropriate for accomplishment of its purposes, or (4) continuation of the restriction on the parcel against which enforcement is claimed or on parcels remaining in a common scheme with it or subject to like restrictions would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas, or (5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest. 





A party who seeks under the third sentence of § 30 to avoid a restriction's bite has the burden of proving that the sentence applies. See Cogliano v. Lyman, 370 Mass. 508 , 512 (1976); Walker v. Sanderson, 348 Mass. 409 , 414 (1965). 





 The Lachowitzes' argument concerning the Order of Conditions implicates clause (5) of the third sentence of § 30: that "enforcement, except by award of money damages, is . . . inequitable or not in the public interest." The Lachowitzes contend that the Order prevents them from re-creating and thereafter maintaining the Greensteins' original water views. The Lachowitzes thus argue it would be against public policy for a court to hold them to their responsibilities under § 2.02. See, for example, McLaughlin v. Amirsaleh, 65 Mass. App. Ct. 873 , 880-881 (2006) (private agreements that violate law or public policy are unenforceable). 





 The Lachowitzes' argument depends on two assumptions: that (1) the Order of Conditions limits the extent of the maintenance allowed on the Northern Portion, consistent with state and local wetlands-protection laws, to restore and maintain the Greensteins' original water views; and (2) the Lachowitzes are maintaining the Northern Portion to that limit. Neither assumption is correct. The evidence shows that in seeking the Order of Conditions, the Lachowitzes pursued principally their own objectives, or what they perceived as the objectives of the Conservation Commission. The Lachowitzes hired a wetlands consultant whom Chairman Hughes suggested, rather than ask the Greensteins what consultant they'd recommend. The Lachowitzes didn't confer with the Greensteins about the work they wanted the Commission to authorize. The Lachowitzes also didn't know (nor did they try to learn) what the Greensteins' water views had been prior to 1999. And despite hearing from Mr. Greenstein, shortly after getting the Order of Conditions, that he wanted his water views restored, the Lachowitzes never have sought any changes to the Order. (Chairman Hughes testified that every order of conditions may be amended.) Instead of trying to respect the Greensteins' rights under § 2.02 of the Master Declaration, the Lachowitzes have renewed the Order of Conditions three times, without amendment. 





 The evidence also shows that the Order of Conditions might not represent the lawful limit on what can be done to restore and thereafter maintain the Greensteins' original water views. Many Hidden Cove properties, including the Showalter and Brothers parcels, are subject to orders of conditions. More extensive cutting is occurring on those properties than what's been since 2004 on the Northern Portion. And Mr. Johnson testified that the maintenance of the other Hidden Cove properties complies with those properties' orders of conditions. 





 The parties didn't place in evidence the orders of conditions for the Showalter, Brothers and other Hidden Cove properties. The Court also doesn't know the circumstances under which the Commission may have issued those orders. But as the parties who are seeking to escape complying with § 2.02 of the Master Declaration, the Lachowitzes bore the burden of proof at trial of showing that their Order of Conditions represents the outer limit of what might be done under applicable law to restore the Greensteins' water views. The Lachowitzes didn't carry that burden. 





 The Lachowitzes also failed to prove the second underpinning of their § 30 public interest defense: that they have maintained, to the fullest extent the Order of Conditions allows, the trees and brush that interfere with the Greensteins' views. Finding #19 highlights the differences between what the Order of Conditions appears to allow and the Lachowitzes' actual maintenance activities. While the Court agrees that some of the Order's provisions are unclear or ambiguous, the Lachowitzes offered no evidence that they ever asked the Conservation Commission to clarify the Order in a manner that would benefit the Greensteins. 





 The Greensteins nevertheless concede in the Proposed Judgment that the Order of Conditions doesn't allow the Lachowitzes to do everything the Greensteins feel is needed to restore and maintain their original views. Their Proposed Judgment would have the Court order the Lachowitzes, at their own expense, to "file papers necessary to obtain an Amendment to the existing Order of Conditions or [file] a new Notice of Intent with the . . . Conservation Commission and diligently pursue an Order of Conditions, and, if necessary, a Superseding Order of Conditions with the DEP [Note 4], and, if necessary, all appeals required to obtain the same," in order to perform four categories of work the Lachowitzes aren't doing already. 





 So the result of issue #4 is this: (a) there's view-restoration and protection work that the Order of Conditions appears to allow, but which the Lachowitzes aren't performing; (b) there's other work whose status under the Order is unclear; and (c) there's restoration and protection work that the Order appears not to allow, but which the Greensteins contend is permissible were the Order amended or a new order sought. Chapter 184, § 30 thus does not prevent the Greensteins from enforcing § 2.02 of the Master Declaration against the Lachowitzes, and the Greensteins are entitled to some sort of remedy on account of the Lachowitzes' violations of § 2.02. The Court ORDERS the parties to appear for hearing by videoconference on June 11, 2021 at 11:30 AM, to discuss the proceedings needed to fashion that remedy. 





SO ORDERED. 





FOOTNOTES
[Note 1] In their proposed judgment and order, the Greensteins define "brush cut" as cutting to a height of six inches or less vegetation having a diameter of less than four inches, by whatever means necessary. They define "selective" brush cutting as not cutting eight species or groupings of plans identified in Condition #10, for the Northern Side of Herring Pond, in the Order of Conditions (the "Northern Portion Conditions"). The Greensteins define "biannually" as "twice per year, once during the time period of October 15-April 30, and once during the period of July 1-July 15." 

[Note 2] With respect to this request, the Greensteins don't use their defined term, "biannually." 

[Note 3] The Lachowitzes offered no evidence that whoever owned the Greenstein Parcel between 1981 (the time of adoption of the Master Declaration in 1981) and 1995 (the year the Greensteins bought the parcel) expanded whatever views existed as of 1981. 

[Note 4] A superseding order of conditions is one that the Commonwealth's Department of Environmental Protection ("DEP") may issue following an appeal to DEP, under the Wetlands Protection Act, from a local conservation commission's order of conditions. See c. 131, § 40. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.